**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

**CASE NO. _____**

IN RE APPLICATION OF
Frederico da Costa Pinto
Pursuant to 28 U.S.C. § 1782
For Judicial Assistance in
Obtaining evidence in this District

_____/

### *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782 AND INCORPORATED MEMORANDUM OF LAW

Applicant, Frederico da Costa Pinto ("Frederico" or "Applicant"), respectfully submits this application for an order for discovery pursuant to 28 U.S.C. § 1782 (the "Application") from Loeb Block & Partners ("Loeb Block"), its attorneys Yuisa Montañez and Steven Rasch, The Clearing House Payments Company L.L.C. ("CHIPS"), Wells Fargo Bank, N.A. ("Wells Fargo"), JP Morgan Chase Bank, N.A. ("Chase"), Citibank, N.A. . ("Citibank"), and Bank of America N.A. ("BOA") (collectively the "Discovery Targets").  The Discovery Targets reside or are found in the Southern District of New York. Applicant requests the discovery sought herein for use in (i) a foreign probate proceeding concerning the estate of Applicant's deceased father, Humberto Da Costa Pinto ("Humberto Sr.") pending before the First Court of Orphans and Successions of the State of Rio de Janeiro, Brazil, Case No.: 0020708-88.2008.8.19.0001(the "Probate Case"); and (ii) a reasonably contemplated civil action for fraud-related claims to be filed in the Civil Court for the State of Rio de Janeiro, Brazil (the "Contemplated Civil Case").  In support thereof, the Applicant states the following:

## FACTUAL BACKGROUND

### I.     The Costa Pinto Companies & The Project Maranhão

The facts relevant to this Application are set forth below and in the attached Sworn Declaration of Henrique Forssell ("Forssell") attached hereto as **Exhibit 1** (the "Forssell Decl."). The Costa Pinto Companies (as defined in the next paragraph below) were a Brazilian-based economic group with various companies in the agriculture industry.  The Costa Pinto Companies were managed by Humberto Costa Pinto ("Humberto Sr.") and his two sons, Humberto da Costa Pinto Junior ("Humberto Jr.") and Applicant.  Forssell Decl. ¶ 4.

In the 1970s the Costa Pinto Companies started a large agricultural sugar and ethanol project in the State of Maranhão, located in the northeast part of Brazil ("Project Maranhão"). Humberto Sr., Humberto Jr. and Applicant incorporated a series of Brazilian companies: (i) Costa Pinto Agroindustrial S/A ("Agro Industrial"); (ii) Costa Pinto Agro Pastoril Ltda. ("Agro Pastoril"); (iii) CP International Ltd. ("CP International"); and (iv) Costa Pinto de Comércio e Indústria S.A. ("Indústria") (collectively, the "Costa Pinto Companies") to own the Maranhão Project's assets and run the business.  *Id.* ¶ 5.  Project Maranhão was a success until 1992 when a shortage of rain in the region caused the Maranhão Project to stop and placed the Costa Pinto Companies in financial turmoil.  *Id.*  ¶ 6.

### II.     The 2003 Cooper Fund Deal

In an attempt to lift the Maranhão Project back on its feet, Applicant and Humberto Jr. spoke to many foreign investors and restructured the corporate ownership of the Maranhão Project's operational companies by creating TG Participações S.A. ("TG Participações") and TG

2

Agro Industrial Ltda. ("TG Agro").   The assets continued to be owned by the Costa Pinto Companies.  *Id.* ¶ 7.  To guarantee that TG Agro could use the land and assets owned by Costa Pinto Companies, a long-term lease agreement was signed by the Costa Pinto Companies and TG Agro.  Consequently, after some failed attempts, in 2002 the Maranhão Project was restarted with funds from foreign investors.  *Id.* ¶ 7.

Nevertheless, in 2002, Humberto Jr. informed Applicant and Humberto Sr. that he had found a new investor for the Maranhão Project.  *Id.* ¶ 8.  Initially, Humberto Jr. did not disclose who this new investor was.  *Id.* ¶ 8.  Eventually, Humberto Sr. and Applicant learned that this new investor was Cooper Omnibus Global Fund, LLC ("Cooper Fund"), a Delaware limited liability company.  *Id.* ¶ 8; *see also* **Exhibit 2**, Cooper Fund's Printout Report from the Delaware Division of Corporations.   Upon information and belief, Cooper Fund has a wholly-owned subsidiary, Cooper Brazil Country Fund I, LLC ("Cooper Fund Brazil"), a Delaware limited liability company.  *Id.* ¶ 8; *see also* **Exhibit 3**, Cooper Fund Brazil's Printout Report from the Delaware Division of Corporations.

The idea was for Cooper Fund to take over the Maranhão Project, including its assets and liabilities.  *Id.*  ¶ 9.  The deal was not to do a final sale of the shares of the Costa Pinto Companies or of TG Participacões to Cooper Fund, but instead a transaction that would allow, if certain terms and returns on the investment were met, the shares to be returned to Humberto Sr., Humberto Jr. and more relevant hereto to Applicant.  *Id.*  ¶ 9.  Specifically, the deal required Applicant and Humberto Sr. to transfer all of their shares in the Costa Pinto Companies to Humberto Jr., which would own them individually until Cooper Fund was paid its entitlements and investment returns under the agreement.  *Id.* ¶ 9.  Subsequently, Humberto Sr. and Applicant agreed to transfer the

shares they owned in Agro Industrial, Agro Pastoril and Agro Indústria to Humberto Jr. subject to specific terms. *Id.* ¶ 10.

Between 2004 and 2007, period that Cooper Fund was supposed to be investing in the Maranhão Project, TG Participações received sixteen (16) transfers from a company domiciled in the British Virgin Islands named Pacificana International Corp. ("Pacificana") in the total amount of US$11,150,000.00. *Id.* ¶ 11; *see also* **Exhibit A** of Forssell Decl., excerpt of the Registry of Financial Transactions (*Registro de Operações Financeiras* or "ROF") issued by the Central Bank of Brazil which tracks foreign currency transfers into and out of Brazil. Apparently, these money transfers were made under the instructions of Cooper Fund and could be part or the total investment made by Cooper Fund until 2007. This is significant, as if only US$11,500,000.00 was invested by Cooper Fund in the Maranhão Project, Cooper Fund and Humberto Jr. would be violating the terms of the agreement with Applicant, causing him substantial damages.

### III.     The Deal With TG Participações And Capinauá

Approximately four (4) years after Humberto Jr. was successful in the deal with Cooper Fund, and one year after the reopening of the Maranhão Project, a new deal was closed involving a new investor to the Maranhão Project, a Brazilian company named Capinauá Empreendimentos e Participações S.A. ("Capinauá"). *Id.* ¶ 12. Capinauá was reported to have joined the project to "conclude the restructuring started by Cooper Fund on this asset Maranhão Project and implement an ambitious expansion plan." *Id.* ¶ 12. For purposes of effecting the partnership, Cooper Fund acquired the Brazilian company Palani Participações S/A ("Palani"), which owned 34.81% of the shares of TG Participações, and Capinauá owned directly the remaining 65.19% of the shares. According to the corporate records of Palani, a total of R$27,739,740.00   (approximately

US$14,200,000.00) was the value of the investment Cooper Fund had in TG Participações which was transferred to Palani in 2007.  Forssell Decl. ¶ 15.

For purposes of the deal, TG Agro was appraised in 2007 for R$135,000,000.00, approximately US$70,000,000.00, including R$101,000,0000.00 for the plant and the sugar cane plantation and R$34,000,000.00 for the lease of the 22,500 hectares of land available for the plantation.  The farms are owned by the Costa Pinto Companies which granted a lease to TG Agro. *Id.* ¶ 14.  Further, TG Participações and Capinauá reported in a lawsuit filed on June 7, 2013, against the Costa Pinto Companies and Palani, to have invested over R$180,000,000.00 approximately US$60,000,000.00, which included the purchase of shares of TG Participações and investments on the farms and the plant.  Capinauá informed that it paid the R$88,000,000.00 necessary for the acquisition of its equity stake in TG Participações.  *Id.* ¶ 16.  Besides the R$88,000,000.00 investment for the purchase of the 65.19% of the shares of TG Participações, Capinauá also agreed to invest the further sum of R$51,500,000.00 to expand the agricultural part of the business, in a deal that would be supported locally by Palani.  The deal was successful and TG Agro, the operational company owned by TG Participações for the Maranhão Project, started the investment and further expansion of the Sentinela agricultural area.  *Id.* ¶ 16.  As a result of this high-value transaction Cooper Fund must have received the financial remuneration that would have triggered the return of Applicant and the decedent, Humberto Sr.'s shares in the Costa Pinto Companies and companies that controlled the Maranhão Project pursuant to the terms of the deal between Applicant and Humberto Jr, referenced in Section IV, and of which Cooper Fund was aware and had acknowledged to its terms. *Id.* ¶ 17.

## IV.    The Deal Between Applicant, Cooper Fund, And Humberto Jr.

Even though Applicant and Humberto Sr. transferred their shares to Humberto Jr. in 2003, it was not until August 2007 that Frederico secured a letter from Humberto Jr. confirming the terms of their deal.  The letter with the terms of the deal reads as follows:

> I, Humberto da Costa Pinto Jr, hereby agree that I will assign 50% of the Asset (defined bellow) to you Frederico da Costa Pinto (2121920-9), in the event that: (i) Cooper Omnibus Global Fund, LLC ("Cooper"), or its wholly owned subsidiary recovers in readily available funds, the total amount of expenses related to and funds invested (the "Investment"), directly or indirectly by Cooper in the Project in Maranhão (the "Asset"), including, but not limited to any and all direct and indirect investment made by Cooper in TG Participacões SA (formerly TG Participacões LTD), plus interest of Libor, plus 2%, calculated on an annual basis from the date of the initial said investment made by Cooper, until the date the Investment is recovered in full by Cooper ("Recovery Date"), (ii) after the Recovery Date Cooper receives 8% premium return on the net value of the Asset, and (iii) Cooper transfers to me personally, all of its ownership (directly or indirectly) in the Asset.

*Id.*  ¶ 18; *see also* **Exhibit 4**, Letter Agreement dated August 2007 by and between Cooper Fund, Applicant, and Humberto Jr.   Also, to ensure what would happen to the shares owned by Applicant in case he died before Cooper Fund had concluded the recovery of its investment plus the interest and equity according to the contract signed between Applicant and Humberto Jr., thus causing the return of the shares of the companies to Humberto Jr. and after that to Applicant, a second document was signed and received by Humberto Jr. on August 22, 2007:

> Dear Humberto, I hereby make reference to the letter to me dated August 21, 2007, (the "Letter") regarding the distribution of Cooper Omnibus Global Fund, LLCs interest in the project in Maranhão (the "Asset"). Further to the Letter, if the conditions therein are met on or after death, I hereby instruct you to distribute my share of the Assets (as described in the Letter) to my children, equally, as follows: Rafael da Costa Pinto, born on December 25, 1972; Fabiana da Costa Pinto, born on August 18, 1974; Carolina da Costa Pinto, born on April 9, 1976; and Letícia da Costa Pinto, born on July 31, 1981.  In the event that any of the above-named children predecease me, their share shall be distributed equally among the other surviving children.

*Id.*  ¶ 19; *see also* **Exhibit B** of Forssell Decl.

Despite their agreement, the lawsuit filed against Palani and the Costa Pinto Companies reveals that it is highly likely that Humberto Jr. is the beneficial owner of Cooper Fund, giving him full control to avoid having to meet the terms of his obligations to Applicant and Humberto Sr. by never allowing for the performance of all of the conditions for the return of the shares. *Id.* ¶ 20.  It is likely that Cooper Fund has already recovered all of its investments and interest on the capital (Libor, plus 2% calculated on an annual basis) in the 2007 transaction with the sale of shares to Capinauá. *Id.* ¶ 21.  At that time, there would have been sufficient funds to pay the 8% premium return on the net value of the Asset (10.8 million reais), thus causing Cooper Fund to have had to return back to Humberto Jr., and thereafter to the Applicant and the decedent, Humberto Sr.,  all the shares of the Costa Pinto Companies and of TG Participações, or at least the shares not sold to Capinauá. *Id.* ¶ 21.  Yet, although Applicant has continuously requested accounting reports and the financial statements of the deal with Cooper Fund in order to determine whether Cooper Fund was close to recovering its agreed investment and earning from the Maranhão Project, Humberto Jr. never provided any documentation. *Id.* ¶ 25.  No receipts or account reports were ever provided by Humberto Jr. or Cooper Fund to Applicant. *Id.* ¶ 25.

Although Applicant has requested accounting reports and the financial state of the deal with the Cooper Fund in order to determine whether Cooper Fund was close to recovering its agreed investment and earning from the Maranhão Project, Humberto Jr. never provided any documentation. *Id.* ¶ 25*; see also* **Exhibit C** to Forssell Decl., e-mail correspondence exchanged between Applicant and Humberto Jr. during October-November, 2014.  No receipts or account reports were ever provided by Humberto Jr. or Cooper Fund to Applicant. *Id.*  In an email exchanged in 2014, Humberto Jr. told Applicant Cooper Fund had invested US$38,645,000.00 by 2007. *Id.* The publicly available records do not appear to show that this amount of investment ever took place, such that is likely that Humberto Jr. continues to own the shares of Cooper Fund never to allow for all conditions of the transaction to take place,

thus never allowing the transfer back of shares to the Applicant.  *Id.*  In his last reply via email dated November 25, 2014, to the Applicant on the issue, without providing any supporting document, Humberto Jr. informed that:

> "Fred,
>
> 1.  Cooper Fund invested directly in the MA operation through TG Participações, for an amount of USD 38,645,000.00 between the years of 2003 and 2007, as shown in the Central Bank of Brazil's foreign investment register (RDE).
> 2.  In 2007, it received USD42,056,224.83 from Angra for its shares in TGP [TG Participações].
> 3.  It incorporated Palani, which took 20% of TGP [TG Participações].
> 4.  Between 2007 and today it has invested a further USD7,255,000 in Palani, all duly registered in the Central Bank's RDE.
> 5.  Since this is private information, we do not know how much was spent in acquisitions made by Banco Pactual, the amounts of the loans of the CP [Costa Pinto] companies, or the cost of lawyers, administrative staff etc... Nor do we know the amount of interest due on the sums invested so far.
>    (...)"

*Id.*; *see also* **Exhibit C** to Forssell Decl. at page 2.

Finally, on an email dated 2014, Humberto Jr., after laying down his views of the issues involving the Costa Pinto Companies from the 1980's, confirmed certain important issues for the current suspicion that in reality he is the sole and exclusive beneficial owner of Cooper Fund:

> Let's register very well this year. During the period of my activities with Jose Braftmam, I was introduced to Antonio Moura Santos, expert negotiator and international investor, and made my relationship closer with Banco Pactual and its president at that time, Eduardo Plass.  I made a presentation of my ideas and projects for Maranhão, taking the opportunity that the industry was picking back and the open perspectives with the arriving of the flex fuel vehicles.  It came from this negotiation and presentations, the central idea of receiving the support through Cooper Fund, in order to create a plan to rescue the debts of the companies and resume the investments CPAI. The situation of the company found by Pactual and Cooper Fund had assets in poor condition.  There were many labor and criminal lawsuits filed against it from former employees, which had stripped the assets of the company.  Many farms, houses, equipment had been fraudulent misappropriated, including the milling.  There was a fraudulent scheme by YPIOCA underway (which I stopped on the Christmas of 2002) to transfer the milling and its accessories to Ceará.  A group of thugs with guns lived in the central house of the distillery.  Additionally, with exception to the debts that negotiated with BOS and Rabobank, all other debts with banks were alive as follows (face value with monetary correction): (a) debts in reais in Brazil = R$30.108.360,00;

(b) debts in dollars in Brazil = USD 19.003.858; and (c) debts in dollars abroad= USD 20.437.853.

*Id.* ¶ 26; *see also* **Exhibit D** to Forssell Decl.

More recently, in an email dated April 3, 2017, Humberto Jr. further confirmed his connections with Cooper Fund. *Id.* ¶ 27. In the email, Humberto Jr. states, that "CPIL [Costa Pinto International] is a dormant company without assets and with debts represented by all debts in foreign currency (USD) of the consolidated contract of debts from 1984, which were acquired by Cooper Fund, with exception for the Comind and Economico." *Id.*; *see also* **Exhibit E** to Forssell Decl. Thereby confirming that Cooper Fund had acquired all debts of the Maranhão Project, exceed for the debts due to two Brazilian banks Comind and Economico. *Id.*

Moreover, in an email dated April 3, 2017, Humberto Jr. provided further support for the well-founded suspicion that he is the beneficial owner of Cooper Fund. *Id.* ¶ 27. In the e-mail, Humberto Jr. states, that "CPIL [Costa Pinto International] is a dormant company without assets and with debts represented by all debts in foreign currency (USD) of the consolidated contract of debts from 1984, which were acquired by Cooper Fund, with exception for the Comind and Economico." *Id.* ¶ 27. This e-mail confirmed that Cooper Fund had acquired all debts of the Maranhão Project except for the debts due to two Brazilian banks, Comind and Economico. *Id.* ¶ 27.

In addition, in connection with Applicant's filing of the §1782 application in the Southern District of Florida, Cooper Fund submitted to that court the sworn declaration of Humberto Jr.'s daughter, Isabela Da Costa Pinto ("Isabela") revealing that the sole member of Cooper Fund is BVF5 Limited, a Bermuda corporation ("BVF5") *Id.* ¶ 28; *see also* **Exhibit F** of Forssell Decl. Isabela signed the sworn declaration in her capacity as Director of BVF5. *Id.* This revelation provides further indicia that Humberto Jr. is likely the beneficial owner or controlling equity holder, directly or indirectly, of Cooper Fund. *Id.*

Also, the Judicial Reorganization Proceeding of TG Participações/TG Agro contains further evidence that Humberto Jr. is likely the beneficial owner of Cooper Fund. *Id.* ¶ 29.  The court documents filed within said judicial reorganization proceeding, especially those related to the Judicial Reorganization Plan, show that Humberto da Costa Pinto Neto ("Humberto Neto"), son of Humberto Jr., now controls the entire operation in Maranhão/Brazil as the sole registered owner of Palani Participações, considering a corporate restructuring accomplished therein. Previously to that, the shares of TG Participações were held by Palani Participações; Capinauá; and Fundação dos Economiários Federais (FUNCEF). *Id.* ¶ 30.

## V.     The Discovery Subject To This Application Is Relevant To A Pending Foreign Proceeding And To A Reasonably Contemplated Foreign Proceeding

Applicant, as one of the two sons of the decedent, Humberto Sr., is entitled to a 25% distribution of the assets that belonged to the decedent pursuant to art. 1,829 of the Brazilian Civil Code.  *Id.* ¶ 34. Therefore, Applicant may be entitled to a 25% distribution of the decedent's shares in the Costa Pinto Companies that were given by him to Humberto Jr. based on the likely false representation that Cooper Fund was owned entirely by foreign investors that did not wish to have a partnership with the Costa Pinto Companies if Applicant and the decedent remain as shareholders.  *Id.*  As a successor for purposes of Brazilian law, Applicant has legal standing to argue that one or more assets have been omitted from the declaration filed by the administrator of the estate (which in this case is Humberto Jr.), and can apply to the court for the inclusion of such assets into the decedent's estate.  *Id.*  The probate proceeding of Humberto Sr. is currently active and pending before the First Court of Orphans and Successions of Rio de Janeiro, Brazil, Case No.: 0020708-88.2008.8.19.0001.  *Id.*

The discovery sought through this Application is aimed to confirm the fact that Humberto Jr. is the beneficial owner, directly or indirectly, of Cooper Fund.  Humberto Jr. convinced Humberto Sr. and Applicant to turn over to him their shares in the Costa Pinto Companies because Humberto Jr. represented that the foreign investor, Cooper Fund, did not want to deal with Applicant and Humberto Sr.  *Id.* ¶ 9-10.  Humberto Jr. used the investment in Cooper Fund as a guise to persuade Applicant into giving him sole ownership of all the shares in the family company. *Id.*  ¶ 38.

A New York law firm, Loeb Block & Partners represented Paul J. Cicurel as the manager and representative for Cooper Fund.  *Id.* ¶ 37.  Applicant met with one of Loeb Block's attorneys, Yuisa Montañez ("Yuisa"), at Humberto Jr.'s office in Rio de Janeiro, Brazil on August 21, 2007. *Id.*  ¶ 37.  Yuisa traveled to Rio to demonstrate the legitimacy of Cooper Fund to Applicant.  *Id.* The purpose of the meeting was to convince Applicant to sign the agreement transferring the company shares over for Humberto Jr. to invest them into Cooper Fund.  *Id.* At this meeting, Applicant informed both Yuisa and Humberto Jr. that he would not sign any agreement until Loeb Block produced a document outlining the terms and conditions for the reversal and return of the company's shares to Applicant's possession.  *Id.* ¶ 37.  Yuisa drafted and sent the letter detailed above to Applicant outlining the agreed terms and conditions of the return of the shares.  Applicant returned the letter to Yuisa with a few comments for clarity on August 22, 2007.  Yuisa and Applicant did not have any further contact regarding the letter until 2015, eight (8) years later. *Id.* ¶ 37.

It appears that Yuisa and Loeb Block & Partners may have facilitated and contributed to Humberto Jr.'s plan to defraud Applicant.  As the attorneys and representatives of Cooper Fund, who claimed the fund only wanted to deal with Humberto Jr., there is reasonable belief that Yuisa

and Loeb Block & Partners could have known of Humberto Jr.'s beneficial ownership of Cooper Fund, and the motives for obtaining all of Applicant's shares in their family company. *Id.* ¶ 38. As the attorneys and representatives of Paul J. Cicurel, who is or was the representative of Cooper Fund, there is reasonable belief that Yuisa and Loeb Block & Partners knew of this material and important fact before the meeting with Applicant on August 21, 2007. If so, Yuisa and Loeb Block & Partners both facilitated and contributed to Humberto Jr.'s plan to defraud Applicant by attesting to the legitimacy of Cooper Fund and the plan to return the company shares back to Applicant. *Id.* ¶ 39.

The key role Loeb Block played in Cooper Fund was confirmed by Paul J. Cicurel, Cooper Fund's manager, during his deposition. Cicurel stated, among other, that "the instructions, if ever, were given to [him] through Steve Rash [attorney at Loeb Block]" who, as assumed by Cicurel, was not acting as a lawyer, but as an agent for Cooper Fund's members. *See* **Exhibit 8**, Cicurel Deposition pp. 38-41. Cicurel also indicated Steve Rash and Yuisa from Loeb Block were the ones with knowledge of who the members of Cooper Fund are and what was the source of the $250,000 paid to Cicurel for "negotiating" a deal for Cooper Fund that was ready. As such, obtaining documents from Loeb Block pertaining to Humberto Jr., Paul J. Cicurel, and/or Cooper Fund will aid in confirming whether Humberto Jr. is in fact the beneficial owner of Cooper Fund, and serve as evidence as to whether he was colluding to defraud Applicant. *Id.*

In addition to the documents from Loeb Block, the Applicant seeks to obtain records of transactions processed through CHIPS which involve Humberto Jr. or any of his four children. There are four major commercial banks in the United States which process foreign wire transfers. *See* **Exhibit 1**, Forssell Decl. at ¶ 41. CHIPS is a payment system used by the four major commercial banks, BOA, Citibank, Chase, and Wells Fargo to process around 95% of all of these

foreign wire transfers in U.S. currency. *Id.* ¶ 42.  Since these four major commercial banks process most of the foreign wire transfers in the United States, it is highly probable that Humberto Jr.'s transactions in relation to Paul J. Cicurel and/or Cooper Fund were processed by one of these banks.  *Id.* ¶ 43.  It follows that since these banks use CHIPS to process around 95% of the foreign wire transfers, that these transfers went through CHIPS and thus that CHIPS likely has the records sought by Applicant.  *Id.* ¶ 43.  The existence and substance of the transaction records will confirm Humberto Jr.'s involvement in Cooper Fund, and determine whether he is the beneficial owner. *Id.* ¶ 44.

If the discovery sought herein confirms that Humberto Jr. is the beneficial owner of Cooper Fund, or that Cooper Fund is his alter ego, Humberto Jr. perpetrated a multi-million-dollar fraud on Applicant and his deceased father, Humberto Sr. Specifically, Applicant could file in Brazil, among others, a civil action for fraud against Humberto Jr. pursuant to Article 186 of the Brazilian Civil Code (the "Brazilian Fraud Case"). Article 186 provides for a general cause of action: "A person who, by voluntary act or omission, negligence or imprudence, violates rights and causes damage to another, even though the damage is exclusively moral, commits an illicit act." Translated in Leslie Rose, O Codigo Civil Brasileiro em Ingles/ The Brazilian Civil Code in English 47 (2008*). Id.* ¶ 49.

Moreover, Article 402 of the Brazilian Civil Code states that "Expect for the exceptions written in the laws, the losses and damages owed to the creditor contemplates, besides what he effectively lost, what he reasonable was not able to profit." such that the Applicant can seek from Humberto Jr. and Cooper Fund all values that he could have being able to profit from the Maranhão Project and the Costa Pinto companies, including his share of the distributable income generated by lease of the farms from 2008 until the day Applicant recovers the shares back.  *Id.* ¶ 52.

Furthermore, article 475 of the Brazilian Civil Code provides that the party damaged by the default can request the rescission of the contract, if it does not choose to request it to be performed, being available, in any of the cases, an award for damages and losses.  *Id.* ¶ 53.

Finally, if the evidence sought in this proceeding confirms that Humberto Jr. is the beneficial owner of Cooper Fund, Applicant may be entitled to bring a claim under art. 145 of the Brazilian Civil Code, according to which a party can apply for the rescission of a contract whenever *fraud* was the cause of it.  *Id.* ¶ 54.

Applicant commits to filing the Contemplated Civil Case within six (6) months of the gathering of discovery in the United States pursuant to §1782 applications. *See* Applicant Decl. ¶7

## RELIEF REQUESTED

Through this Application, the Applicant seeks to access all non-privileged documents from Loeb Block & Partners and attorneys Yuisa Montañez and Steven Rasch concerning or relating to Humberto Jr., Paul J. Cicurel, and/or Cooper Fund, as well as all records of transfers from CHIPS, BOA, Citibank, Chase, and Wells Fargo involving Humberto Jr. as well as any of his four children, where their names are listed as either the transferor, the transferee, or anywhere in the memo or transfer details.  The Applicant also respectfully requests that the Court grant leave to file Notice(s) of Intent to Serve Subpoena(s) to any other parties residing or found within the Southern District of New York having additional documents or testimony related to the Brazilian Probate Case or to the Contemplated Civil Case allowing for the issuance of any additional subpoena fifteen (15) days after the filing of the Notice of Intent to Serve Subpoena unless there is an objection filed in this action.

## CONCLUSION

The Applicant respectfully request that this Court enter an Order granting the following relief: (a) compelling the production of the documents identified herein within thirty (30) days of entry of the Court's Order; (b) directing Loeb Block, attorneys Yuisa Montañez and Steven Rasch, BOA, Citibank, Chase, Wells Fargo, and CHIPS to preserve the evidence sought by the Applicant in order to ensure that the evidence sought is not lost or destroyed in the interim; and (c) allowing the Applicant to issue additional discovery requests to other parties located or residing within the Southern District of New York likely to have relevant documentary or testimonial evidence related to the Brazilian Probate Case or to the Contemplated Civil Case.

## **MEMORANDUM OF LAW**

### **I.**

### **THE APPLICANT'S APPLICATION MEETS ALL OF THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782**

28 U.S.C. § 1782 provides in part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court … The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28. U.S.C. § 1782(a).

Courts have distilled from the statutory language of 28 U.S.C. § 1782 the following basic requirements for its invocation: (1) the application is made by a foreign or international tribunal or **any interested person**; (2) the request must seek evidence, whether it be the testimony or

statement of a person or the production of a document or other thing; (3) the discovery is for use in a foreign proceeding before a foreign or international tribunal; and (4) the person from whom discovery is sought resides or is found in the district of the district court to which the application is made. *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (emphasis added); *See Brandi–Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246-47 (2004).

The Applicant's Application meets all of the statutory requirements of 28 U.S.C. § 1782.

## A.  The Applicant is an "Interested Person" Under Section 1782

The Applicant is an "interested person" within the meaning of section 1782, because he is gathering this evidence and testimony for use in a foreign tribunal in connection with the reasonably contemplated Brazilian Fraud Case.  The *Intel* court focused heavily on the statutory language granting discovery to an "interested person."  *See Intel*, 542 U.S. at 256.  In *Intel*, the Court easily defined an "interested person" as a litigant in a proceeding.  *Id.*  But the *Intel* court went further, finding that interested person has a broader meaning.  *Id.*  An interested person is someone that has a role in submitting evidence and participation rights in the foreign tribunal, defined as someone possessing a "reasonable interest in obtaining judicial assistance."  *Id.* Specifically, in *Intel*, the Supreme Court found that a complainant who triggered an investigative commission proceeding was an "interested person," because such an individual had a "reasonable interest in obtaining judicial assistance."  *See Intel*, 542 U.S. at 256-57 (explaining that the complainant "possesses a reasonable interest in obtaining judicial assistance and therefore qualifies as an interested person within any fair construction of the term") (citing Smit, *International Litigation* at 1027 for the proposition that "any interested person is intended to include not only litigants before foreign or international tribunals, but also foreign and international officials as well

as any other person whether he be designated by foreign law or international convention or merely possess a reasonable interest in obtaining the assistance."); *see also In re Application of Sumar*, 123 F.R.D. 467, 470 (S.D.N.Y. 1988) (holding that "[t]he mere fact that the criminal action in question was commenced [by the petitioner] as a querellante does not . . . affect petitioner's standing to request compliance with . . . 28 U.S.C. § 1782.").

Undoubtedly, the Applicant here is an "interested person" within the meaning of section 1782. The Second Circuit held that the brother of an intestate decedent was deemed an "interested person" who, by law, could seek a discovery order from the district court for use in probate proceedings before a foreign tribunal. *See Application of Esses*, 101 F. 3d 873, 875 (2d Cir. 1996). In the instant matter, the Applicant is seeking to gather evidence and testimony for use in a foreign tribunal in connection with the already pending and active Probate Case. *See* **Exhibit 6**, printout of the docket of the pending Probate Case. As an heir, Applicant has legal standing to receive a 25% distribution of all benefits arising from Humberto Sr.'s shares in the Costa Pinto Companies that were given by him to Humberto Jr., in the case the transfer of shares voided based on the false representation that Cooper Fund was owned entirely by foreign investors. Pavan Decl. ¶¶ 10-11. As an heir, Applicant intends to file a motion in the pending Probate Case regarding his decedent's father's shares in the Costa Pinto Companies. Applicant Decl. ¶ 7. In the Contemplated Civil Case, the Applicant will submit evidence and have participation rights as the lead plaintiff. As set out in the Forssell Decl., Applicant has a variety of civil claims to be asserted against Humberto Jr. and Cooper Fund upon obtaining the requested discovery. The existence of these civil claims has also been confirmed by the independent legal opinion of Pavan. Pavan Decl. ¶¶ 6-9. Thus, because the Applicant requires discovery from the Discovery Targets in order obtain information to pursue his legal rights in the pending Probate Case as well as in the Contemplated Civil Case,

his interest in obtaining judicial assistance is reasonable and satisfies the requirements of section 1782.

**B.  The Applicant's Application Requests Documentary and Testimonial Evidence**

The Application requests documentary evidence from the Discovery Targets, mainly, all non-privileged documents from Loeb Block & Partners and attorneys Yuisa Montañez and Steven Rasch, concerning or relating to Humberto Jr., Paul J. Cicurel, and/or Cooper Fund, as well as all records of transfers from Wells Fargo Bank, N.A., JP Morgan Chase Bank, N.A., Citibank, N.A., and Bank of America N.A., and CHIPS involving Humberto Jr. as well as any of his four children, which will constitute proof of the fraudulent scheme Humberto Jr. perpetrated against Applicant and their father with the assistance of Loeb Block & Partners, Yuisa Montañez, Steven Rasch, Paul J. Cicurel, and/or Cooper Fund. This request satisfies the section 1782 requirement that the request must seek evidence, whether it be the testimony or statement of a person, or the production of a document or other thing. *See Intel*, 542 U.S. at 249.

**C.  The Discovery Targets are Found in the Southern District of New York**

The Discovery Targets both reside or are found in this judicial district as required under section 1782.  The Second Circuit in *In re del Valle Ruiz* noted that courts have consistently given broad interpretations to the statutory language of section 1782 and held that the "resides or is found" language in the statute "extends to the limits of personal jurisdiction consistent with due process."  *In re del Valle Ruiz,* 939 F.3d 520, 528 (2d Cir. 2019).  In order to show personal jurisdiction, the targets must have sufficient minimum contacts in the district so as not to offend traditional notions of fair play and substantial justice.  *Id.*; *See also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014).

The Law Firm of Loeb Block & Partners resides and is found in this federal judicial district. Loeb Block is a Law firm located in New York County with an office at 505 Park Avenue, 8th Floor, New York, New York 10022.  Upon information and belief, the firm and its employees regularly conduct their business in this judicial district.  Unlike the discovery target in *In re del Valle Ruiz*, which the court found to only have had activities in the district after the commencement of the 1782 application, Loeb Block has been conducting business in this district long before this application or Applicant's deal with Humberto Jr. arose.  Their business included representing Cooper Fund and, as a result, they are directly involved in Humberto Jr.'s scheme to defraud Applicant.  Therefore, Loeb Block's business activities show sufficient minimum contacts such that maintenance of this application would not offend traditional notions of fair play and substantial justice.

CHIPS also resides or is found in this federal judicial district.  The Clearing House itself is headquartered in New York County at 1114 Avenue of the Americas, 17th Floor, New York, New York 10036.  Additionally, the four major commercial banks in the United States which use CHIPS to process foreign wire transfers all regularly transact business in, are located in, and/or are headquartered in New York County.  BOA is located and regularly transacts business at 115 West 42nd Street, New York, New York 10036.  Citibank is headquartered at 388 Greenwich Street New York, New York 10013.  Chase is headquartered at 270 Park Avenue, New York, New York 10017.  Wells Fargo is located and regularly transacts business at 500 West 33rd Street, New York, New York 10001.  All of these entities have been conducting business at one or multiple locations in this judicial district long before this application or the transactions in question arose and as such they satisfy the standard set out in *In re del Valle Ruiz*.

Both Discovery Targets regularly conduct business in and are physically located in this judicial district.  Accordingly, the Discovery Targets both reside or are found within the District in which the Applicant seeks discovery as set forth by the requirements of 28 U.S.C. § 1782(a).

**D.  The Evidence Will Be Used in Proceedings in a Foreign or International Tribunal**

For the purposes of section 1782, an investigation or potential lawsuit is a "proceeding." *See Intel*, 542 U.S. at 259.  The Supreme Court expressly rejected the notion that the proceeding must be pending or imminent.  *Id*. (holding that discovery was proper under § 1782 even though the applicant's complaint against the opposing party was only in the investigative stage (citing Smit, *International Litigation* 1026 for the proposition that "[i]t is not necessary ... for the [adjudicative] proceeding to be pending at the time the evidence is sought, but only that the evidence is eventually to be used in such a proceeding.")).  The Second Circuit has followed suit in *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, where the court concluded that the planned proceedings only need to be "within reasonable contemplation" and that the intent of obtaining the evidence must be to eventually use it in the planned proceeding at the time it is sought.  *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.,* 798 F.3d 113, 123 (2d Cir. 2015); *See also Intel*, 542 U.S. at 259.  In other words, the court's determination turns on whether the evidence will likely be used in a proceeding, not whether the proceeding is pending.  *See In re Application of Sumar*, 123 F.R.D. 467, 470 (S.D.N.Y. 1988).  Moreover, federal courts have already granted 1782 applications in support of anticipated foreign fraud proceedings.  *See, e.g., In re Chevron Corp.*, 633 F.3d 153 (3d Cir. 2011).

Here, the facts show the Application meets the prerequisites established above.  Evidence of documentation related to Cooper Fund is necessary to support the Applicant's finding and reasonable suspicion that Humberto Jr. is the beneficial owner or controlling equity holder of

Cooper Fund.  As detailed *supra*, the Applicant's investigation has revealed that Humberto Jr. is the likely beneficial owner of Cooper Fund, thereby committing fraud and stripping Applicant's and Humberto Sr.'s shares in the Costa Pinto Companies without consideration and under false pretenses.  As set out above, Applicant has several potential causes of action against Humberto Jr., Cooper Fund and other third parties as a result of Humberto Jr.'s suspected fraudulent acts.  In addition, Applicant has submitted reliable evidence that he is entitled to a distribution of his deceased father's shares in the Costa Pinto Companies in the pending Probate Case. Thus, the Applicant respectfully submits that the section 1782 foreign or international tribunal requirement is met as a result of the Applicant's legal standing to pursue his rights in the Probate Case as well as in reasonably contemplated proceeding in Brazil (the Contemplated Civil Case) for the purposes of: (i) obtaining his shares in the Costa Pinto Companies or receiving adequate consideration for same; (ii) obtaining a distribution of his deceased father's shares in the Costa Pinto Companies.

### E.  Granting the Application Would Foster the Twin Policy Aims Behind Section 1782

Granting the Application would also foster section 1782's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts."  *Intel*, 542 U.S. at 252 (internal quotations omitted).[1] The first aim would be served because the proposed discovery is narrowly tailored to seek discovery of information that is likely to be highly relevant to the Applicant's reasonably contemplated legal action to obtain his shares in the Costa Pinto Companies or receiving adequate consideration for same.  Thus, granting the Application would be an efficient means of assistance

---

[1] These "twin aims" are consistent with the legislative history of section 1782, as recognized in John Deere, 754 F.2d at 135 (legislative history of § 1782 "reflects a determination on the part of Congress to broaden the scope of international judicial assistance afforded by the federal courts" and that, through its passage, Congress hoped that it would stimulate reciprocal aid from other countries).

to a party before a foreign tribunal.  *See Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996) (goals of section 1782, which dates back to 1855, are to provide "equitable and efficacious" discovery procedures in U.S. courts 'for the benefit of tribunals and litigants involved in litigation with international aspects'") (quoting S. Rep. No. 1580, 88th Cong., 2d Sess. 2 (1964) ("Senate Report")); *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 135 (3d Cir. 1985) (noting that a "liberal intent to provide judicial assistance" has been "acknowledged as a primary statutory goal since section 1782's inception").

The second aim would be served because granting the Application would further the exchange of judicial assistance between the United States and Brazil.  *See John Deere*, 754 F.2d at 135 (noting that section 1782 takes into account "considerations of comity and sovereignty that pervade international law" and that reciprocity is not a requirement for its application); Senate Report, at 2 (section 1782 reflects "a major step in bringing the United States to the forefront of nations adjusting their procedures to those of sister nations" and an "effort[ ] to improve practices of international cooperation in litigation").

Accordingly, both the *Intel* factors and the "twin aims" of section 1782 support the granting of this Application.

In summary, because the Applicant has sufficiently met all of the requirements for invoking 28 U.S.C. § 1782, this Court has jurisdiction to order the Discovery Targets to provide the requested discovery.

## II.

### THIS COURT SHOULD EXERCISE ITS JURISDICTION PURSUANT TO SECTION 1782 AND GRANT THE APPLICATION

Once a court has determined that the statutory requirements for relief under section 1782 have been met, the court is vested with the discretion to afford that relief.  In *Intel*, the Supreme

Court delineated certain factors that district courts should apply in deciding whether section 1782 relief should be granted to an applicant. *Intel*, 542 U.S. 241.  Those factors are:

> "(1) whether the person from whom discovery is sought is a participant in the foreign proceeding," in which event the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is unduly intrusive or burdensome."

*In re del Valle Ruiz* at 533-34 (internal quotations omitted); *see also Intel*, 542 U.S. 241.

All of these factors support the granting of this Application.

## A.  The Discovery Targets are not Potential Defendants in the Contemplated Litigation and Applicant Cannot Get Discovery from Cooper Fund in Brazil

First, the Discovery Targets are not expected to be participants in the reasonably contemplated fraud litigation in Brazil.  Loeb Block is the law firm that represented Paul J. Cicurel as the manager of Cooper Fund.  Cooper Fund is one of the potential defendants in the contemplated fraud litigation but the law firm which represented them and their manager, Loeb Block, is not.  Additionally, CHIPS is the payment system which simply holds the records of the transactions involving one of the potential defendants in the contemplated fraud litigation, Humberto Jr.  CHIPS itself, or any of the banks that use the system are not potential defendants.  Therefore, section 1782 plays a very significant role in the Applicant's ability to obtain discovery from the Discovery Targets.

## B.  The Relevant Tribunals, Laws, and Rules are Not Hostile to this Application

Second, there is no Brazilian law, rule of evidence or rule of civil or criminal procedure prohibiting the filing of this Application or the request made in it.  Forssell Decl. ¶ 55. Therefore, it is likely that the foreign tribunal will be receptive to the evidence sought in this Application.

## C. The Application is Not Filed to Circumvent Any Brazilian Law or Rule

Third, this Application is not interposed for any improper purpose or to circumvent any Brazilian law or rule. Forssell Decl. ¶ 55. Indeed, the Application is the only practical way that the Applicant has to obtain highly relevant evidence held by the Discovery Targets which can uncover relevant and highly probative evidence to support that Humberto Jr. is in fact the beneficial owner of Cooper Fund. Without section 1782 relief, the Applicant will be foreclosed from obtaining key evidence and more importantly he will be forever barred from uncovering any assets of which he has been robbed of.

## D. The Application and Discovery Requests are Narrowly Tailored

Finally, this Application is narrowly tailored to the subject matter of the Probate Case and the Contemplated Civil Case and is therefore not intrusive or burdensome. In short, the factors identified by the *Intel* and *In re del Valle Ruiz* Courts all favor the granting of the Application.

## III.

## THE DISCOVERY TARGETS SHOULD PRESERVE RELEVANT EVIDENCE

Given that the requested evidence is for use in civil proceedings and that there are possible wrongdoers involved in the suspected information sought to be discovered, the Applicant seeks this relief on an *ex parte* basis and seeks an order directing the Discovery Targets to **preserve** the evidence sought by the Applicant. Any issues that the Discovery Targets may have with the proposed discovery can be addressed in response to the requested discovery. *Gushlak v. Gushlak*, 486 Fed.Appx. 215, 217 (2d Cir. 2002) (". . . it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*. The respondent's due process rights

are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)").

Given that the relevant events took place beginning in 2003 and continued through present, the Applicant is concerned that some or all of the documentary evidence sought may be lost or jeopardized by the Discovery Targets' document retention and destruction policies or otherwise. To the extent that any of the requested evidence may be discarded or deleted, manually or automatically, the Discovery Targets should be directed to preserve all such potentially relevant evidence. *See In re St. Jude Medical, Inc.*, 2002 WL 341019 *1 (D. Minn. 2002) (ordering parties to preserve electronic documents in their possession, custody, or control that contain information potentially relevant to the litigation); *In re Cell Pathways, Inc.*, 203 F.R.D. 189, 195 (E.D. Pa. 2001) (same); *see also Mosel Vitelic Corp. v. Micron Tech., Inc.*, 162 F. Supp. 2d 307, 310-11 (D. Del. 2000) ("A party, who is aware that evidence might be relevant to a pending or future litigation, has an affirmative duty to preserve this material" and "[t]his duty extends to that party's attorneys") (internal citations and quotations omitted); *Positran Mfg., Inc. v. Diebold, Inc.*, 2003 WL 21104954, at *2 (D. Del. 2003) (same).

**WHEREFORE**, for the foregoing reasons, Applicant Frederico de Costa Pinto respectfully requests that the Court enter an Order: (i) granting this Application for discovery pursuant to 28 U.S.C. § 1782; (ii) compelling the production of the documents set forth in the proposed subpoenas attached hereto as composite **Exhibit 5** within thirty days; directing Loeb Block & Partners, attorneys Yuisa Montañez and Steven Rasch, Wells Fargo Bank, N.A., JP Morgan Chase Bank, N.A., Citibank, N.A., and Bank of America N.A., and CHIPS to duly preserve all evidence related to the subject matter of this Application; and (iii) and allowing the Applicant to issue additional subpoenas fifteen (15) days after the filing of Notice of Intent to

Serve Subpoena, to any other party residing or found within the Southern District of New York,

likely to have relevant evidence to be used in the foreign Probate Case or the Contemplated Civil

Case.

Dated: August 10, 2021.                              Respectfully submitted,

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
777 Arthur Godfrey Road, Suite 402
Miami Beach, Florida 33140
E-mail: rodrigo@rdasilvalaw.com
Telephone:    (305) 615-1434
Facsimile:     (305) 615-1435

By:    */s/ Rodrigo S. Da Silva*  _____
Rodrigo S. Da Silva, Esq.
*Counsel for Applicant, Frederico Da Costa Pinto*